# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| KOREA CGM MEMBERS ASSOCIATION, a non-profit corporation organized and existing under the laws of the Republic of Korea, | |
| Plaintiff, | C.A. No. 24-cv-267-GBW |
| v. | |
| NETFLIX, INC., , | |
| Defendant. | |

## PLAINTIFF'S OPPOSITION TO DEFENDANT NETFLIX, INC.'S MOTION TO DISMISS AND MOTION TO STRIKE THE AMENDED COMPLAINT

Dated: September 9, 2024

Of Counsel:

Alexander Rufus-Isaacs
RUFUS-ISAACS ACLAND &
GRANTHAM LLP
9440 Santa Monica Blvd., Suite 301
Beverly Hills, CA 90210
Phone: (310) 274-3803
aisaacs@rufuslaw.com

Brian E. Farnan (Bar No. 4089)
Michael J. Farnan (Bar No. 5165)
FARNAN LLP
919 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 777-0300
bfarnan@farnanlaw.com
mfarnan@farnanlaw.com

*Attorneys for Plaintiff*

## <u>TABLE OF CONTENTS</u>

**PRELIMINARY STATEMENT** ...................................................................................... 1

**ARGUMENT** .................................................................................................................... 2

   **I.**   *FORUM NON CONVENIENS* **DISMISSAL SHOULD BE DENIED** ........................ 2

      **A.**  The Framework for Analysis ................................................................. 2

      **B.**  Korea is an Adequate Available Forum ............................................... 2

      **C.**  CGM's Choice of Delaware is Entitled to Significant Deference ............ 2

      **D.**  The *Gilbert* Convenience Factors do Not Justify Dismissal ................ 8

  **II.**   **CGM HAS ARTICLE III STANDING** ....................................................... 13

 **III.**   **CGM HAS PLAUSIBLY PLED DEFAMATORY STATEMENTS OF AND
        CONCERNING CGM** ................................................................................ 14

  **IV.**   **THE DEFAMATION IS NOT SUBSTANTIALLY TRUE** .................... 17

   **V.**   **CGM HAS PLAUSIBLY PLED ACTUAL MALICE** ........................... 20

  **VI.**   **CALIFORNIA'S ANTI-SLAPP PROCEDURE HAS NO APPLICATION IN
        THIS  LITIGATION** ................................................................................. 27

# TABLE OF AUTHORITIES

**Cases**

*Abbas v. Foreign Policy Grp., LLC,*
    783 F.3d 1328 (D.C. Cir. 2015) .................................................................. 29, 30

*American Dredging Co. v. Miller,*
    510 U.S. 443 (1994).......................................................................................... 3

*Anderson v. Liberty Lobby,*
    477 U.S. 242 (1986)........................................................................................ 22

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009)............................................................................. 20, 21, 22

*Baker v. Joseph,*
    No. 12-CV-23300-UU, 2013 WL 12094322 (S.D. Fla. May 30, 2013) .................. 23

*Bartholomew v. YouTube, LLC,*
    17 Cal. App. 5th 1217 (2017)........................................................................... 17

*Bell Atlantic Corporation v. Twombly,*
    550 U.S. 544 (2007)......................................................................... 20, 21, 22, 23

*Biro v. Conde Nast,*
    807 F.3d 541 (2d Cir. 2015) ............................................................................. 23

*Briggs v. Eden Council for Hope & Opportunity,*
    19 Cal.4th 1106 (1999) ................................................................................... 28

*Broughty v. Bouzy,*
    No. CV226458SDWJRA, 2023 WL 5013654 (D.N.J. Aug. 7, 2023) ...................... 30

*Burnett v. National Enquirer, Inc.,*
    144 Cal. App. 3d 991 (Ct. App. 1983) .............................................................. 25

*Butowsky v. Folkenflik,*
    No. 4:18CV442, 2019 WL 3712026 (E.D. Tex. Aug. 7, 2019) .............................. 22

*Carbone v. Cable News Network, Inc.,*
    910 F.3d 1345(11th Cir. 2018) ........................................................................ 29

*Carijano v. Occidental Petroleum Corp.,*
    643 F.3d 1216 (9th Cir. 2011) ........................................................................... 8

*Celle v. Filipino Reporter Enterprises Inc.*,
209 F.3d 163 (2d Cir. 2000) ........................................................ 26

*Chaplake Holdings, LTD. v. Chrysler Corp.*,
766 A.2d 1 (Del. 2001) ........................................................ 27, 29

*Chigurupati v. Daiichi Sankyo Co.*,
480 F. App'x 672 (3d Cir. 2012) ........................................................ 2

*Ciemniecki v. Parker McCay P.A.*,
Civ. No. 09–6450 (RBK/KMW), 2010 WL 2326209 (D.N.J. June 7, 2010) ............................ 24

*Cooper v. Tokyo Elec. Power Co.*,
860 F.3d 1193 (2017) ........................................................ 4

*Curtis Publishing Co. v. Butts*,
388 U.S. 130 (1967) ........................................................ 25

*D.A.R.E America v. Rolling Stone Magazine*,
101 F. Supp. 2d 1270 (C.D. Cal. 2000*), aff'd sub nom.*, *D.A.R.E. America v. Rolling Stone
Magazine*, 270 F.3d 793 (9th Cir. 2001) ........................................................ 19, 20

*Eastwood v. National Enquirer, Inc.*,
123 F.3d 1249 (9th Cir. 1997) ........................................................ 21, 26

*Eliott v. Lions Gate Ent. Corp.*,
639 F. Supp. 3d 1012 (C.D. Cal. 2022) ........................................................ 17, 18, 19

*FG SRC LLC v. Xilinx, Inc.*,
No. CV 20-601-LPS, 2021 WL 495614 (D. Del. Feb. 10, 2021) ........................................ 4

*Franklin v. Dynamic Details, Inc.*
116 Cal. App. 4th 375 (2003) ........................................................ 17

*Galustian v. Peter*,
591 F.3d 724 (4th Cir. 2010) ........................................................ 7

*Global Relief v. New York Times Co.*,
No. 01 C 8821, 2002 WL 31045394 (N.D. Ill. Sept. 11, 2002 ........................................ 28

*Godin v. Schencks*,
629 F.3d 79 (1st Cir. 2010) ........................................................ 29

*Golden Bear Distributing Systems v. Chase Revel, Inc.*,
708 F.2d 944 (5th Cir. 1983) ........................................................ 25

*Guam Federation of Teachers. v. Ysrael*,
   492 F.2d 438 (9th Cir. 1974), *cert. denied*, 419 U.S. 872 (1974) ...................................... 21, 26

*Gulf Oil Corp. v. Gilbert*,
   330 U.S. 501 (1947) ...................................................................................................... 2, 6, 8

*Hansen v. Stoll,*
   130 Ariz. 454 (Ariz. Ct. App. 1981) ...................................................................................... 24

*Harte-Hanks Communications, Inc. v. Connaughton*,
   491 U.S. 657 (1989) ................................................................................................................ 25

*Helicos Biosciences Corp. v. Illumina, Inc.*,
   858 F. Supp. 2d 367 (D. Del. 2012) ......................................................................................... 5

*Herbert v. Lando*,
   441 U.S. 153 (1979) ........................................................................................................... 21, 24

*Hollywood Innovations Group LLC v. Netflix, Inc.*,
   No. 2:21-cv-9423, 2022 WL 4121244  (C.D. Cal., Feb. 4, 2022) ............................................ 3

*Hollywood Innovations Grp., LLC v. Netflix, Inc.*,
   No. CV2109423TJHJCX, 2022 WL 18584763 (C.D. Cal. Aug. 12, 2022 ................................ 4

*Hutchinson v. Proxmire*,
   443 U.S. 111 (1979) ................................................................................................................ 22

*In re Johnson & Johnson Talcum Powder Products Manufacturing, Sales Practices, and*
   *Products Liability Litigation*,
   553 F. Supp. 3d 211 (D.N.J. 2021) .......................................................................................... 30

*Iragorri v. United Techs. Corp.*,
   274 F.3d 65 (2d Cir. 2001) ........................................................................................................ 2

*Jane Doe L.C. v. Aimbridge Hosp., LLC*,
   No. CV 19-1762 (MN), 2020 WL 5633363 (D. Del. Sept. 21, 2020) ....................................... 3

*Keeton v. Hustler Magazine*,
   465 U.S. 770 (1984) ........................................................................................................... 11, 12

*Klocke v. Watson*,
   936 F.3d 240 (5th Cir. 2019) .................................................................................................... 29

*La Liberte v. Reid*,
   966 F.3d 79 (2d Cir. 2020) ....................................................................................................... 29

*Lony v. E.I. Du Pont de Nemours & Co.*,
   886 F.2d 628 (3d Cir.1989) ............................................................................ 6

*Lony v. E.I. Du Pont de Nemours & Co.*,
   935 F.2d 604 (3d Cir. 1991) ........................................................................... 7

*Los Lobos Renewable Power, LLC v. Americulture, Inc.*,
   885 F.3d 659 (10th Cir. 2018) ...................................................................... 28

*Lynch v. Ackley*,
   Civ. No. 3:12CV537 (JBA), 2012 WL 6553649 (D. Conn. Dec. 14, 2012) ............................ 24

*Makaeff v. Trump University, LLC*,
   715 F.3d 254 (9th Cir. 2013) ......................................................................... 29

*Makaeff v. Trump University, LLC*,
   736 F.3d 1180 (9th Cir. 2013) ....................................................................... 29

*Manzari v. Associated Newspapers Ltd.*,
   830 F.3d 881 (9th Cir. 2016) ......................................................................... 21

*Maple Heights News v. Lansky*,
   No. 1:15CV53, 2015 WL 4730737 (N.D. Ohio Aug. 10, 2015) .................................... 23

*Masson v. New Yorker Magazine, Inc.*,
   501 U.S. 496 (1991) ...................................................................................... 18

*Monsanto Co. v. Aetna Cas. & Sur. Co.*,
   1993 WL 563244 (Del. Super. Dec. 21, 1993) ...................................................... 27

*My Size, Inc. v. Mizrahi*,
   193 F. Supp. 3d 327 (D. Del. 2016) .................................................................. 2

*Neitzke v. Williams*,
   490 U.S. 319 (1989) ...................................................................................... 21

*New York Times Co. v. Sullivan*,
   376 U.S. 254 (1964) ...................................................................................... 11

*Otto Candies, LLC v. Citigroup*, Inc.,
   963 F.3d 1331 (11th Cir. 2020) ...................................................................... 7

*Pain v. United Techs. Corp.*,
   637 F.2d 775 (D.C. Cir. 1980) ....................................................................... 7

*Palin v. New York Times,*
    940 F.3d 804 (2d Cir. 2019) ...................................................................... 24

*Papst Licensing GmbH & Co. KG v. Lattice Semiconductor Corp.,*
    126 F. Supp. 3d 430 (D. Del. 2015) ............................................................ 5

*Patel v. Chavez,*
    48 Cal. App. 5th 484 (2020).................................................................... 28

*Pep v. Newsweek, Inc.,*
    553 F. Supp. 1000 (S.D. N.Y. 1983) .......................................................... 26

*Peregrine Myanmar Ltd. v. Segal,*
    89 F.3d 41 (2d Cir. 1996) ......................................................................... 7

*Perk v. Reader's Digest Ass'n, Inc.,*
    931 F.2d 408 (6th Cir. 1991) .................................................................... 27

*Philadelphia Newspapers, Inc. v. Hepps,*
    475 U.S. 767 (1986)............................................................................... 11

*Phoenix Canada Oil Co. v. Texaco, Inc.,*
    78 F.R.D. 445 (D. Del. 1978) .................................................................... 7

*Pierson v. National Institute for Labor Relations Research,*
    319 F. Supp. 3d 1100 (N.D. Ind. 2018)...................................................... 23

*Piper Aircraft Co. v. Reyno,*
    454 U.S. 235 (1981)......................................................................... 6, 7, 8

*Presbyterian Church of Sudan v. Talisman Energy, Inc.,*
    244 F. Supp. 2d 289 (S.D.N.Y. 2003) .......................................................... 8

*Reavis v. Gulf Oil Corp.,*
    85 F.R.D. 666 (D. Del. 1980)...................................................................... 6

*San Diegans for Open Government v. San Diego State University Research Foundation,*
    13 Cal.App.5th 76 (2017) ........................................................................ 28

*Scheuer v. Rhodes,*
    416 U.S. 232 (1974)........................................................................... 21, 22

*Schiavone Construction Co. v. Time, Inc.,*
    847 F.2d 1069 (3d Cir. 1988) .............................................................. 21, 25

*Shady Grove Orthopedic Associates, P.A. v. Allstate Insurance Co.*,
    559 U.S. 393 (2010) ..................................................................................... 29

*Shi v. New Mighty U.S. Trust*,
    918 F.3d 944 (D.C. Cir. 2019) .............................................................. 5, 9

*Silicon Knights, Inc. v. Crystal Dynamics, Inc.*,
    983 F. Supp. 1303 (N.D. Cal. 1997) ........................................................ 16

*Sinochem International Co. v. Malay. International Shipping Corp.*,
    549 U.S. 422 (2007 ......................................................................................... 5

*Spacecon Specialty Contractors, LLC v. Bensinger*,
    No. 09CV02080REBKLM, 2010 WL 3720166 (D. Colo. Sept. 15, 2010) ............................. 23

*Spirito v. Peninsula Airport Commission*,
    350 F. Supp. 3d 471 (E.D. Va. 2018) ...................................................... 22

*St. Amant v. Thompson*,
    390 U.S. 727 (1968) ............................................................................... 21, 26

*Tech. Dev. Co. v. Onischenko*,
    536 F. Supp. 2d 511 (D.N.J. 2007) ............................................................. 7

*Tiversa Holding Corp. v. LabMD, Inc.*,
    Civ. A. No. 13–1296, 2014 WL 1584211 (W.D. Pa. Apr. 21, 2014) ....................... 23

*Trout Point Lodge, Ltd. v. Handshoe*,
    729 F.3d 481 (5th Cir. 2013) ..................................................................... 11

*TSMC Tech., Inc. v. Zond, LLC*,
    *C.A.* 14–721–LPS–CJB, 2014 WL 7251188 (D. Del. Dec. 19, 2014, *adopted by* 2015 WL
    328334 (D. Del. Jan. 26, 2015) ..................................................................... 5

*United States ex rel. Newsham v. Lockheed Missiles & Space Co.*,
    190 F.3d 963 (9th Cir.1999) ....................................................................... 29

*Wehling v. Columbia Broadcasting System*,
    721 F.2d 506, 509 (1983)…………………………………………………………...18

*Weller v. American Broadcasting Companies, Inc.*,
    232 Cal. App. 3d 991 (1991) ....................................................................... 17

*Williams v. Netflix, Inc.*,
    No. CV 22-1132-CFC, 2023 WL 3478568 (D. Del. May 16, 2023) ........................ 4

*Windt v. Qwest Communications International, Inc*.,
   529 F.3d 183 (3d Cir. 2008) ................................................................................. 2

*Wit Software v. Talkdesk, Inc*.,
   No. CV 23-94-WCB, 2023 WL 3454193 (D. Del. May 15, 2023)............................................ 6

*Zerangue v. TSP Newspapers, Inc.*,
   814 F.2d 1066 (5th Cir. 1987)............................................................................. 25

**Statutes**

28 U.S.C. § 1404(a) ............................................................................................... 4, 5

28 U.S.C. § 4102(a)(1)(A), (B)............................................................................. 10

Cal. Code of Civ. P. § 425.16 .............................................................................. 27, 28

Securing the Protection of our Enduring and Established Constitutional Heritage Act, Pub. L. No.
   111-223, § 1, 124 Stat. 2380, codified as 28 U.S.C. §§ 4101-4105..................................... 9, 11

**Other Authorities**

Ahran Park, Kyu Ho Youm, Fake News from A Legal Perspective: The United States and South
   Korea Compared, 25 Sw. J. Int'l L. 100, 115 (2019) ................................................... 11

Article 764 of the Korean Civil Act ("Minbeop [Civil Act] art. 764 (S. Kor.) ............................ 10

Chapter 33, "Crimes Against Reputation," comprised of articles 307 through 312 of the Statutes
   of the Republic of Korea.................................................................................. 10

DAEHANMINKUK HUNBEOB [HUNBEOB] [CONSTITUTION] art. 21 (S. Kor.)............... 10

Kyung S. Park & Jong-Sung You, Criminal Prosecutions for Defamation and Insult in South
   Korea with a Leflarian Study in Election Contexts,
   12 U. PA. Asian L. Rev. 463, 475 (2017) ............................................................... 11

Maggie Gardner, *Retiring Forum Non Conveniens*,
   92 N.Y.U. L. REV. 390, 409 (2017).......................................................................... 9

Rebeca Xu, K-Pop's Secret Weapon: South Korea's Criminal Defamation Laws,
   24 San Diego International L.J., 201 (2022)............................................................... 10

Restatement Second, Torts § 580A, comment d at 219 (1977)..................................................... 26

**Rules**

Fed. R. Civ. P. 8(a) ......................................................................................... 22, 31

Fed. R. Civ. P. 12(b)(6) ............................................................................... 22

**Treatises**

D. Elder, *Defamation: A Lawyer's Guide* § 7.12 (2016) ............................. 25

Robert Sack, *Libel, Slander, and Related Problems* 138 (1980)................... 18

Rodney Smolla, *Law of Defamation* (2024 Update Ed.). ......................... 15, 18, 20, 21

## PRELIMINARY STATEMENT

This is a defamation action brought by the Plaintiff, Korea CGM Members Association, against Netflix, arising from the documentary series entitled *In the Name of God: A Holy Betrayal* ("Series") "CGM" is an acronym for the religious organization known as the Christian Gospel Mission. The gist of the alleged defamation is that Netflix broadcast false and defamatory claims that CGM caused, condoned, or encouraged CGM members to procure women for the sexual gratification of CGM's leader, Jeong Myong-Seok ("Pastor Joshua"), and that CGM caused, condoned, encouraged, or facilitated its members to beat, kidnap, threaten, and intimidate persons perceived as hostile to CGM. CGM maintains that any allegations that it was complicit in such sexual trafficking and violence are fabricated. In its Opening Memorandum, Netflix, with unseemly hubris, refuses to call CGM by its name, instead re-naming it "CGMMA." But it is not for Netflix to make up new names for CGM any more than to make up false statements about it.

CGM has filed, contemporaneously with this Responsive Memorandum, a voluntary dismissal of the "Doe Defendants" sued in CGM's Amended Complaint. By dropping the Doe Defendants from the case, CGM has removed uncertainty about their citizenship and cured any purported lack of diversity subject matter jurisdiction.

This Memorandum responds to the remaining grounds for dismissal interposed by Netflix: (1) *Forum Non Conveniens*; (2) standing; (3) defamatory meaning "of and concerning" CGM; (4) substantial truth; (5) actual malice; and (6) the applicability of California's anti-SLAPP law.

## ARGUMENT

## I.    *FORUM NON CONVENIENS* DISMISSAL SHOULD BE DENIED

### A.    The Framework for Analysis

"It is settled that the defendant bears the burden of persuasion as to all elements of the *forum non conveniens* analysis." *My Size, Inc. v. Mizrahi*, 193 F. Supp. 3d 327, 335 (D. Del. 2016). The analysis proceeds in three steps: (1) evaluating the availability of an adequate alternative forum in the foreign nation to hear the case; (2)    evaluating the appropriate level of deference due to the plaintiff's choice of forum; and (3) weighing the relevant "private interest factors" and "public interest factors." . *See, e.g., Windt v. Qwest Communications International, Inc*., 529 F.3d 183, 189 (3d Cir. 2008); *Chigurupati v. Daiichi Sankyo Co.*, 480 F. App'x 672, 674 (3d Cir. 2012).

### B.    Korea is an Adequate Available Forum

CGM concedes that South Korea is an adequate available forum, in the general sense that Korean courts provide an orderly judicial forum for the resolution of defamation disputes.

### C.    CGM's Choice of Delaware is Entitled to Significant Deference

The leading and still controlling case applying the *forum non conveniens* doctrine is the decision by the United States Supreme Court in *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501 (1947). The driving rationale animating *forum non conveniens* law is the notion that courts should police against suits brought in an inconvenient forum for purposes of imposing oppression and vexation upon a defendant. *Id.* at 508 ("It is often said that the plaintiff may not, by choice of an inconvenient forum, 'vex,' 'harass,' or 'oppress' the defendant by inflicting upon him expense or trouble not necessary to his own right to pursue his remedy."); *Iragorri v. United Techs. Corp.*, 274 F.3d 65, 72–73 (2d Cir. 2001) ("We thus understand the Supreme Court's teachings on the deference due to plaintiff's forum choice as instructing that we give greater deference to a plaintiff's forum choice to the extent that it was motivated by legitimate reasons, including the plaintiff's convenience and

the ability of a U.S. resident plaintiff to obtain jurisdiction over the defendant, and diminishing deference to a plaintiff's forum choice to the extent that it was motivated by tactical advantage."); *Jane Doe L.C. v. Aimbridge Hosp., LLC*, No. CV 19-1762 (MN), 2020 WL 5633363, at *2 (D. Del. Sept. 21, 2020) (recognizing that federal doctrine of *forum non conveniens* applies "when an alternative forum has jurisdiction to hear [a] case, and when trial in the chosen forum would establish ... oppressiveness and vexation to a defendant ... out of all proportion to plaintiff's convenience …") (quoting *American Dredging Co. v. Miller*, 510 U.S. 443, 447-48 (1994)) (internal quotations omitted).

Typically, this involves bringing a *foreign* defendant into an *American* court. But it is hard to argue that vexation and oppression exist when the defendant is being sued on the defendant's home turf. And that is the situation here.

As set forth in the Declaration of Dong Won Kwak filed as Exhibit A with this Memorandum, CGM did *not* choose Delaware for its suit against Netflix in order to vex Netflix. Rather, CGM chose Delaware because it believed that jurisdiction over Netflix in Delaware would be automatic and uncontestable by Netflix, whereas CGM could not be certain that Korea would have jurisdiction over Netflix. The more prudent course for CGM was thus to sue in Delaware, Netflix's state of incorporation, where personal jurisdiction was beyond doubt.

Netflix now seeks to remove that doubt by stating it would consent to jurisdiction in Korea. This appears to be a standard tactic in Netflix's playbook. In the *Hollywood Innovations* case cited by Netflix, Netflix argued to have the case moved from federal court in California to South Korea, and consented to jurisdiction in Korea, in language virtually identical to that used here. *See Hollywood Innovations Group LLC v. Netflix, Inc.*, No. 2:21-cv-9423, Defendant Netflix's Notice of Motion and Motion to Dismiss Complaint, 2022 WL 4121244 (C.D. Cal., Feb. 4, 2022)

("Netflix has a Korean presence (Chung Decl. ¶ 2) and, in any event, would consent to the jurisdiction of the Korean courts in the event that the Court dismisses this case."). Yet despite this concession by Netflix, the California federal court *denied* Netflix's Motion to Dismiss on *forum non conveniens* grounds, stating: "After balancing the public and private factors, the Court concludes that Netflix failed to satisfy its heavy burden of showing that this case would be inconvenient to try in this Court." *Hollywood Innovations Grp., LLC v. Netflix, Inc.*, No. CV2109423TJHJCX, 2022 WL 18584763, at *7 (C.D. Cal. Aug. 12, 2022) (citing *Cooper v. Tokyo Elec. Power Co.*, 860 F.3d 1193, 1210 (2017)).

What matters most at this preliminary stage of the *forum non conveniens* analysis is that CGM's decision to sue in Delaware was plainly not brought to vex or harass Netflix by haling it into a distant forum but rather so that CGM could ensure that it would not be embroiled in a battle over Korean jurisdiction. Indeed, by choosing Delaware, CGM has provided Netflix with perhaps its most convenient forum for litigation. In a slightly different context, Chief Judge Connolly rejected an almost identical attempt by Netflix to transfer a defamation action to a New York federal court under 28 U.S.C. § 1404(a). *Williams v. Netflix, Inc*., No. CV 22-1132-CFC, 2023 WL 3478568, at *1 (D. Del. May 16, 2023). Chief Judge Connolly agreed with the plaintiff there that transfer under § 1404(a) was unwarranted because it was not certain that Netflix could have originally been sued in New York, given doubts about whether New York's long-arm statute would have permitted jurisdiction there. When a plaintiff picks Delaware as the forum because the plaintiff knows jurisdiction exists in Delaware but harbors doubts about jurisdiction elsewhere, that choice is by definition not vexatious, but rational. "This Court 'has repeatedly found that it is plainly rational and legitimate for a plaintiff to choose to sue a defendant in that defendant's state of incorporation.'" *FG SRC LLC v. Xilinx, Inc.*, No. CV 20-601-LPS, 2021 WL 495614, at *3 (D.

4

Del. Feb. 10, 2021). *See also Papst Licensing GmbH & Co. KG v. Lattice Semiconductor Corp.*, 126 F. Supp. 3d 430, 438 (D. Del. 2015) ("Our Court has repeatedly found that it is plainly rational and legitimate for a plaintiff to choose to sue a defendant in that defendant's state of incorporation—a district where a plaintiff can have some certainty that there will be personal jurisdiction over the defendant.") (citing *TSMC Tech., Inc. v. Zond, LLC, C.A*. 14–721–LPS–CJB, 2014 WL 7251188, at *15 (D. Del. Dec. 19, 2014) (collecting cases), *adopted by* 2015 WL 328334 (D. Del. Jan. 26, 2015) and *Helicos Biosciences Corp. v. Illumina, Inc*., 858 F. Supp. 2d 367, 373 (D. Del. 2012)).

To be sure, this is a *forum non conveniens* motion and not a transfer motion under § 1404(a). But *forum non conveniens* and § 1404(a) are jurisprudential first cousins. *Forum non conveniens* is the common law mechanism used by federal courts to push cases out of the United States, and § 1404(a) is the statutory mechanism governing federal court-to-court transfers within the United States. However, the policies that drive the analysis under both mechanisms are essentially identical. Under both *forum non conveniens* and § 1404(a), a plaintiff's choice of a forum is entitled to significant deference. *See Shi v. New Mighty U.S. Trust*, 918 F.3d 944, 950 (D.C. Cir. 2019) ("Although a district court may dismiss a complaint on *forum non conveniens* grounds even where the plaintiff had no alternative forum available until the defendants later consented to appear in their preferred forum, . . . the lack of an original alternative forum constitutes a 'legitimate reason' for a foreign plaintiff's choice of a U.S. forum.").

Depending on the circumstances, the law accords different levels of deference to Plaintiff's choice of forum. Plaintiff's choice of forum—here the choice of CGM to sue in Delaware—begins with a presumption favoring that choice. "A defendant invoking *forum non conveniens* ordinarily *bears a heavy burden* in opposing the plaintiff's chosen forum," *Sinochem International Co. v.*

*Malay. International Shipping Corp.*, 549 U.S. 422, 430 (2007) (emphasis added). "[U]nless the balance is strongly in favor of the defendant, the plaintiff's choice of forum should rarely be disturbed." *Gilbert*, 330 U.S. at 508. While plaintiffs start with a presumption in their favor, the strength of the presumption varies with the parties' nationalities.  The highest level of deference, a level so high as to be almost impossible to overcome, is applied when an American plaintiff sues a foreign defendant. *Id.* The lowest level, described as "less deference," applies when a foreign plaintiff sues a foreign defendant. *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 256 (1981). A middle deference level, described as "significant," applies when a foreign plaintiff sues an American defendant on the American defendant's "home turf."  This middle level of significant deference properly applies here.

This middle level of significant deference makes perfect sense. "The fact that a foreign plaintiff 'is suing the defendant in the latter's home forum" is a relevant consideration in determining convenience." *Wit Software v. Talkdesk, Inc*., No. CV 23-94-WCB, 2023 WL 3454193, at *5–6 (D. Del. May 15, 2023). As the Third Circuit has observed:  "The foreign plaintiff is suing the defendant in the latter's home forum where the latter's corporate headquarters, headquarters of the division in question, and research laboratories are located. That in itself has considerable weight in showing that the plaintiff's choice was based on convenience." *Lony v. E.I. Du Pont de Nemours & Co*., 886 F.2d 628, 634 (3d Cir.1989). Notably, this Court may easily take judicial notice of this Court's own docket, revealing that Netflix is *constantly* a litigant in this Court—with too many reported cases to warrant taking up space in this Memorandum.

CGM does not claim that Netflix's incorporation in Delaware automatically requires deference to CGM's forum choice, but CGM does argue, as many courts have recognized, that significant deference to CGM's choice is mandated. *See, e.g., Reavis v. Gulf Oil Corp*., 85 F.R.D.

666, 673 (D. Del. 1980) ("First, Delaware is the state in which two of the defendants are incorporated; an especially strong showing is required to support a *forum non conveniens motion* where "plaintiff has ceded defendants the 'home turf' advantage.") (citing *Phoenix Canada Oil Co. v. Texaco, Inc.,* 78 F.R.D. 445, 453 (D. Del. 1978)  ("This conclusion particularly is compelled by the realization that plaintiff has ceded defendants the 'home turf' advantage.")); *Tech. Dev. Co. v. Onischenko*, 536 F. Supp. 2d 511, 520 (D.N.J. 2007) (finding that the defendant's residence in the home state supported the finding that the American forum was convenient, applying a level of deference that the court called "significant" but not as great as that owed American plaintiffs: "The Court finds that TTDC's choice of forum is entitled to significant deference, although not the level of deference owed to a domestic plaintiff, because of the evidence demonstrating that its decision was motivated by convenience."); *Otto Candies, LLC v. Citigroup*, Inc., 963 F.3d 1331, 1343 (11th Cir. 2020) (collecting cases, and requiring that the defendant "demonstrate—with positive evidence—why litigating on its home turf would be so oppressive and vexatious that a federal court should decline jurisdiction"); *Galustian v. Peter*, 591 F.3d 724, 732 (4th Cir. 2010) (providing greater deference in favor of a domestic forum where "the defendant is a resident and citizen of the forum he seeks to have declared inconvenient for litigation"); *Peregrine Myanmar Ltd. v. Segal*, 89 F.3d 41, 46 (2d Cir. 1996) (in weighing the *Gulf Oil* factors, "the court starts with a presumption in favor of the plaintiff's choice of forum, especially if the defendant resides in the chosen forum, as here"); *Lony v. E.I. Du Pont de Nemours & Co*., 935 F.2d 604, 608 (3d Cir. 1991) ("This case is puzzling in that frequently the forum non conveniens issue is raised by a defendant sued away from home who seeks to convince the court that the balance of relevant factors should be tipped against requiring it to defend in a forum far from its home jurisdiction."). *See also  Piper Aircraft*,

454 at 256 n.24 (citing *Pain v. United Techs. Corp.*, 637 F.2d 775, 797 (D.C. Cir. 1980), for the proposition that "citizenship and residence are proxies for convenience.").

Finally, it is worth noting that American courts are particularly wary of foreign plaintiffs who seek jurisdiction in the United States because the laws may be more favorable to their claims. See *Piper Aircraft*, 454 U.S. at 249 n. 15, ("[D]ismissal may be warranted where a plaintiff chooses a particular forum, not because it is convenient, but solely in order to ... take advantage of favorable law."). But here, United States law, with its ample First Amendment protections, is *more favorable* to Netflix than Korean defamation law, which is much more strongly tilted toward plaintiffs, and the protection of reputation, than freedom of speech. This surely factors against any lament by Netflix that it must litigate in the United States.

### D.     The *Gilbert* Convenience Factors do Not Justify Dismissal

The Court's final task is to weigh the private and public interest factors emanating from *Gilbert*. As in many cases, some of the *Gilbert* factors here favor CGM, some favor Netflix, some are essentially a wash, and some do not apply. But this Court should bear in mind that CGM starts off ahead of the game, with the significant presumption in its favor. It is not enough for Netflix to win by a little. It must win by a lot. "The test for *forum non conveniens* is not a simple matter of which side has the weightier argument. Instead, the burden is on the defendant to show that the factors tilt 'strongly' in favor of trial in a foreign forum." *Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 244 F. Supp. 2d 289, 335 (S.D.N.Y. 2003). CGM addresses below the factors it deems most salient to each side:

*Sources of Proof.* The events occurred in Korea, and proof of those events favors Netflix. But, the decisions of Netflix germane to matters such as actual malice occurred in the United States and proof regarding those issues, favors CGM. This factor is equally balanced. *See Carijano v.*

*Occidental Petroleum Corp.*, 643 F.3d 1216, 1235 (9th Cir. 2011) ("[W]e have cautioned that the focus for this private interest analysis 'should not rest on the number of witnesses ... in each locale' but rather the court 'should evaluate the materiality and importance of the anticipated ... witnesses' testimony and then determine their accessibility and convenience to the forum.'").

As far as the cost of witness travel is concerned, some witnesses will have to cross the Pacific Ocean no matter where the case is tried. Witnesses from the United States, such as persons with decision making authority within Netflix who were involved with the broadcast, would have to travel to Korea if tried there. To the extent that Korean witnesses are called to Delaware, CGM is willing to bear that cost, and so this factor does not weigh in favor of a foreign forum.

To the extent that proof in the case will involve documents, the case presents a tie, as there will be documents on both sides of the ocean, and digital exchanges are easy in both directions. "Inconvenience" is not what it used to be. Technology and changes in international travel have altered the picture. "Logistical hurdles to obtaining evidence and voluntary testimony in the United States present less of a problem than they used to in light of technological advances and the ease of international travel." *Shi*, 918 F.3d at 951–52; Maggie Gardner, *Retiring Forum Non Conveniens*, 92 N.Y.U. L. REV. 390, 409 (2017).

**Enforceability in the United States.** This factor favors CGM. A Korean judgment would not be enforceable against Netflix in the United States, because of the Securing the Protection of our Enduring and Established Constitutional Heritage Act, Pub. L. No. 111-223, § 1, 124 Stat. 2380, codified as 28 U.S.C. §§ 4101-4105 (the "SPEECH Act"). The SPEECH Act prohibits any federal or state court in the United States from recognizing or enforcing a foreign judgment for defamation unless "the foreign court's adjudication provided at least as much protection for freedom of speech and press in that case as would be provided by the first amendment" or "the

party opposing recognition or enforcement of that foreign judgment would have been found liable for defamation by a domestic court applying the first amendment." 28 U.S.C. § 4102(a)(1)(A), (B).

Korean defamation law does not meet the First Amendment requirements imposed under the United States Constitution. Korean defamation law is very different from American constitutional defamation law, with no comparable free speech protections. Korea's criminal defamation law is codified in Chapter 33, "Crimes Against Reputation," comprised of articles 307 through 312 of the Statutes of the Republic of Korea. Available at: https://elaw.klri.re.kr/eng_service/lawView.do?hseq=28627&lang=ENG. Korean law criminalizes defamation, often with harsh penalties, including imprisonment and fines, and it includes defamation of the dead. The defense of "justification" is available if the facts alleged "are true and solely for the public interest." Article 308. See also Rebeca Xu, K-Pop's Secret Weapon: South Korea's Criminal Defamation Laws, 24 San Diego International L.J., 201 (2022). Korean law also recognizes defamation as a tort. Article 764 of the Korean Civil Act ("Minbeop [Civil Act] art. 764 (S. Kor.) provides for damages and measures such as requirement for a public apology. Indeed, the Constitution of Korea tilts Korean law toward protection of reputation and honor over freedom of speech, stating that "neither speech nor press shall violate the honor or rights of other persons nor undermine public morals or social ethics." DAEHANMINKUK HUNBEOB [HUNBEOB] [CONSTITUTION] art. 21 (S. Kor.). No protective fault standard akin to American constitutional "actual malice" is provided for under either Korea's harsh criminal or civil defamation regimes, characteristics often noted by scholars and human rights organizations. *See* Ahran Park, Kyu Ho Youm, Fake News from A Legal Perspective: The United States and South Korea Compared, 25 Sw. J. Int'l L. 100, 115 (2019); Kyung S. Park & Jong-Sung You, Criminal Prosecutions for

10

Defamation and Insult in South Korea with a Leflarian Study in Election Contexts, 12 U. PA. Asian L. Rev. 463, 475 (2017). Korean law thus directly conflicts with American constitutional principles on such fundamental elements as falsity and fault. *See Philadelphia Newspapers, Inc. v. Hepps*, 475 U.S. 767 (1986) (plaintiff bears burden of proving falsity); *New York Times Co. v. Sullivan*, 376 U.S. 254 (1964) (requiring actual malice). This means that a victory in Korea by CGM would not be enforceable in the United States. See *Trout Point Lodge, Ltd. v. Handshoe,* 729 F.3d 481, 487 (5th Cir. 2013) (concluding that under the SPEECH Act a Canadian defamation judgment could not be enforced in the United States).

>    ***Public Interest Factors.*** There are public interest factors favoring the interests of Delaware and the United States and their citizens on the one hand, and public interest factors favoring the interests of Korea and its citizens on the other. Court dockets in Delaware are crowded, but that is true across the United States and the world. Delaware has chosen to emphasize its role as one of the centers of incorporation for major American and international companies, and in so doing, accepts the availability of its courts to resolve disputes involving those companies. And, while the burden of jury duty imposed on a Delaware jury pool favors Netflix, jury duty is again a "cost of doing business" for Delaware's franchise as a world corporate epicenter. These points favor CGM. While members of CGM world-wide have interest in this defamation action, it is likely of most interest to Korean citizens, and therefore, this point slightly favors Netflix.

>    Finally, this Court should take seriously the local interest of Delaware, considered individually and as a surrogate for all jurisdictions in the United States and world-wide, as a forum for adjudicating, with all the protections granted by the First Amendment, a defamation dispute that calls into question the truth and accuracy of events presented in a world-wide broadcast. The Supreme Court's decision in *Keeton v. Hustler Magazine*, 465 U.S. 770 (1984), is illustrative.

*Keeton* emphasized the multi-state characteristics of defamation cases, and the *collective* interest of all the states in ensuring that a forum will exist for the vindication of the reputation of the plaintiff suffered in all states in which the libel was published, an interest that the forum state is justified in asserting on its own behalf and as representative for the other states in our federal system. *Id.* at 777 ("New Hampshire also has a substantial interest in cooperating with other States, through the 'single publication rule,' to provide a forum for efficiently litigating all issues and damage claims arising out of a libel in a unitary proceeding."). As *Keeton* explained, under the operation of the "single publication rule" a libel plaintiff may seek recovery (and indeed, is *required* to seek recovery) for damages arising in all jurisdictions from the single publication of libelous material reaching that multitude of jurisdictions. *Id.* at 773, n. 2. New Hampshire, the Court in *Keeton* held, had an interest in protecting even a non-resident from the harms done to reputation in the state, even if that non-resident was anonymous prior to the publication. "The reputation of the libel victim may suffer harm even in a state in which he has hitherto been anonymous. The communication of the libel may create a negative reputation among the residents of a jurisdiction where the plaintiff's previous reputation was, however small, at least unblemished." *Id.* at 776-77.

  *Keeton* is also powerful in its emphasis on the reality that false statements not only damage the victim of defamation, but all *readers* who are misled by such false statements. New Hampshire, the Court explained, had a constitutionally cognizable interest in redressing the damage done to New Hampshire residents who were exposed to the defamatory falsehood, an interest independent of any harm done to the defamation plaintiff. "False statements of fact harm both the subject of the falsehood *and* the readers of the statement. New Hampshire may rightly employ its libel' laws

12

to discourage the deception of its citizens." *Id*. at 776 (emphasis in original). Here, the fact that Delaware citizens were misled by the Series is another public interest factor favoring Delaware.

## II.      CGM HAS ARTICLE III STANDING

Just as Netflix somewhat arrogantly renamed CGM, it wrongly attempts to morph the standing question by framing it as an "organizational standing" issue, in which the organization litigates on behalf of individuals within the organization. That body of "organizational standing" law has no applicability here. CGM is not suing as the surrogate for its members. CGM is suing in its institutional capacity as a church for the damage done directly to it as a church. The Netflix motion conflates standing with defamatory meaning, and concomitantly, the "of and concerning" doctrine, as well as with ultimate liability itself. Or to put it more simply, if the *In the Name of God* documentary may be plausibly understood as defaming CGM itself—if it is "of and concerning" CGM, then *automatically* standing exists. At the end of the day, of course, CGM may or may not win on the merits, but that is for adjudication down the road—not for disposition on the standing question. What matters then, is whether CGM has plausibly pled defamatory meaning of and concerning CGM.

The Amended Complaint ("AC") makes it clear that this is a suit brought by CGM *in its own right*. It alleges that Netflix chose "to portray CGM as a corrupt and criminal *organization*." ¶ 2 (emphasis added). It alleges that Netflix blamed "a violent kidnapping and a vicious beating on CGM even though CGM was not responsible for either." ¶ 3. It alleges that Netflix "shows that the procurement of these women had been *institutionalized within CGM*" and that "CGM is portrayed *as an organization*" that procured women for Pastor Joshua. ¶ 2 (emphasis added). Netflix stated that "[t]he *church* had a history of attacking those who left or criticized it." ¶ 22 (emphasis added). And it alleges that Netflix depicted CGM as an entity which adopted the "Fox

Hunt Plan" to retaliate against a hostile activist. ¶ 25. Netflix thus intended to "portray CGM *as a criminal organization* that institutionalized and condoned the beating, kidnapping, threatening and intimidation of persons whom it perceived to be hostile." ¶ 29 (emphasis added).

## III. CGM HAS PLAUSIBLY PLED DEFAMATORY STATEMENTS OF AND CONCERNING CGM

Netflix does not make the argument, and could not make the argument, that imputations of such wrongdoing as procuring victims for rape and sexual assault or complicity in kidnappings, beatings, and threats are not defamatory. Of course they are. What Netflix really argues is that the Complaint fails to identify with sufficient particularity those elements of the broadcast that impute these actions to CGM as an organization. Netflix's argument appears in two sections of its Memorandum, one dealing with "defamatory meaning" and the other explicitly with the fundamental "of and concerning" requirement. Netflix Memorandum at 15 and 20-23. Yet the two arguments are essentially one, both distilled to the claim that the Series does not defame CGM. At the outset, this Court should reject out of hand the hyper-technical claim that the documentary is really about "CGMMA," not CGM. That distinction is utterly too thin to bear weight. A defendant cannot simply rename the plaintiff and then assert that the defamation is about the plaintiff that the defendant invented. CGM is the named plaintiff, period. AC, ¶¶ 1, 4.

In the AC, CGM has easily satisfied all that is required under federal pleading standards and substantive defamation law in alleging that the Series contains defamatory falsehoods "of and concerning" CGM. The Complaint is replete with specific time-stamped references to the episode segments and specific allegations as to how those segments are of and concerning CGM as an institution. Netflix appears to argue that because the acts of procuring women or engaging in beatings and kidnapping and threats were portrayed in the Series as carried out by *members* of CGM, it follows that CGM as an *entity* was not defamed. But this has never been the law. If it

14

were, no corporation or organization, for-profit or non-profit, could ever be defamed, because corporations and organizations can only act through human beings, such as employees, agents or members:

> Because corporations and organizations are artificial beings, they can be accused of wrongdoing only through the actions of natural human beings. Thus in all successful corporate or organizational defamation actions, the damage to the corporate or organizational reputation is predicated on false and defamatory allegations of behavior engaged in by individual human beings, behavior that is deemed fairly attributable to the corporation or organization. A corporation cannot commit a wrong except through the wrongdoing of the human beings that comprise it.

Rodney Smolla, *Law of Defamation* § 4:39 (2024 Update Ed.)

Throughout the AC, CGM has plausibly pled that specifically identified material in the broadcast depicted CGM as organizationally complicit in the defamatory actions described. *See* AC ¶ 11 (identifying Episode 1, 38:41 as depicting the procurement of women for Pastor Joshua; ¶ 12 (identifying Episode 3, 29:27 as claiming through Maple Yip that she was persuaded by a member acting for CGM and left by that member in Pastor Joshua's quarters to have sex with him); ¶¶ 13, 14, 15 (identifying Episodes 1 40:31, 41:09, 41:37, 3 36:00 as depicting CGM as an organization rewarding members who recruited women for Pastor Joshua's sexual gratification); ¶ 16 (identifying Episode 2 26:10 as portraying CGM as instructing members "to go to CGM's photographic studio in Seoul and pose in their underwear, or naked, or masturbating."); ¶ 20 (identifying Episode 1 5:55, 6:27, and 6:23 as depicting CGM as attempting to impede and threaten Ms. Yip, through staged visual depictions, Ms. Yip's comments, and text messages displayed); ¶ 21 (identifying Episode 1, 7:27, 8:42, 9:17, 9:40, and 9:47 as depicting CGM as harassing, intimidating, and threatening Ms. Yip); ¶ 22 (identifying Episode 2 0:56, 1:34, 2:22, 6:55, and 7:05 as depicting CGM as abducting and beating Ms. Hwang, including such statements as "The church had a history of attacking those who left or criticized it," then showing CGM members beating an

informant); ¶ 23 (identifying Episode 2 36:56 – 37:15 as depicting CGM as having "indoctrinated" members to "exterminate" activists hostile to CGM, including Kim Do-Hyeong ("KDH") whom CGM regarded as hostile to it); ¶ 24 (identifying Episode 2: 37:38, 39:03, 39:20 as depicting Kim Hyeong-Jin as having been threatened, intimidated, and attacked on the stairs of his apartment, implying CGM was complicit in the retaliatory attacks); ¶ 25 (identifying Episode 2 42:16, 44:25, 45:06, 45:21 as depicting CGM as devising the "Fox Hunt Plan" and through that plan being complicit in the surveillance, stalking, and beating of KDH's father); ¶ 26 (identifying Episode 3 43:22 as depicting CGM as willing to "do anything to try and stop members" from alleging sexual assault by Paster Joshua because "we have the experience and stories that can ruin their religion.").

Netflix is simply wrong that CGM has failed to allege the defamatory statements with sufficient particularity. *In the Name of God* is a documentary series, in which meaning is conveyed through a blend of visual images, staged scenes, displayed text, and spoken words. "While the exact words or circumstances of the slander need not be alleged to state a claim for defamation, the substance of the defamatory statement must be alleged*." Silicon Knights, Inc. v. Crystal Dynamics, Inc.*, 983 F. Supp. 1303, 1314 (N.D. Cal. 1997). CGM has done exactly that.

Netflix appears to rest its defense on the assertion that reasonable viewers would have viewed the film the way Netflix claims—as depicting all the procurement of women, indoctrination, intimidation, kidnappings, beatings, and threats as conducted by rogue individual *members* of CGM not acting for CGM itself. But CGM has plausibly alleged that the entire *thrust* of the Series targets CGM as directly complicit in this wrongdoing. That Netflix may proffer its own sanitized version of the Series "misses the point: If the broadcasts could reasonably have been understood as implying the defamatory statements upon which respondents based their claim, but also could have been understood in an innocent sense, the jury must decide in what manner the

16

broadcasts were ultimately understood." *Weller v. American Broadcasting Companies, Inc*. 232 Cal. App. 3d 991, 1003 (1991). For when a "statement is susceptible of both an innocent and a libelous meaning, . . . the jury must decide how the statement was understood." *Franklin v. Dynamic Details, Inc*. 116 Cal. App. 4th 375, 385 (2003). That CGM is not referenced explicitly by name in every allegedly offending segment is no bar to its defamation claim, for "[i]t is not necessary that plaintiff should be mentioned by name if the words used in describing the person meant, can be shown to have referred to him and to have been so understood." *Bartholomew v. YouTube, LLC.*, 17 Cal. App. 5th 1217, 1231 (2017).

## IV.     THE DEFAMATION IS NOT SUBSTANTIALLY TRUE

Netflix argues that even if it is wrong, and *In the Name of God* actually could be reasonably understood as "of and concerning" CGM as an entity, Netflix still deserves to win, "because an average viewer would see no distinction between the admitted conduct of Pastor Joshua and his followers, and the encouragement of that conduct by the religious organization over which he serves as sole leader and messiah." Netflix Memorandum at 16 (citing *Eliott v. Lions Gate Ent. Corp.*, 639 F. Supp. 3d 1012, 1026-27 (C.D. Cal. 2022)).

This argument is a sleight of hand. It fails to grapple with what CGM has actually alleged, and fails to properly characterize the holding of the *Eliot* case upon which it relies. CGM has alleged that "it was certainly not aware of any such conduct and it never condoned, encouraged or facilitated it." AC ¶ 10. CGM has alleged that it is simply false that "CGM caused, condoned, encouraged or facilitated its members to recruit attractive young women for the specific purpose of procuring them for Pastor Joshua's sexual gratification." AC ¶ 17(a). CGM has alleged that it is simply false that "CGM rewarded its members for procuring young women for Pastor Joshua's sexual gratification." AC ¶ 17(b). CGM has alleged that it is simply false that as an organization

"CGM knew that Pastor Joshua was sexually assaulting young Members on a regular basis but did nothing to stop it." AC ¶ 17(c). CGM has alleged that it is false that it was aware of the foregoing activity and failed to stop it, and that it is false that it recruited alleged victims of Pastor Joshua to become recruiters and procurers for him at the behest of CGM. AC ¶¶ 17, 18, 19.

Netflix is correct that the test is whether what Netflix portrayed will "'have a different effect on the mind of the reader from that which the pleaded truth would have produced.'" *Masson v. New Yorker Magazine, Inc*., 501 U.S. 496, 517 (1991) (quoting Robert Sack, *Libel, Slander, and Related Problems* 138 (1980) and citing *Wehling v. Columbia Broadcasting System*, 721 F.2d 506, 509 (1983), and Smolla, *Law of Defamation* § 5.08). But Netflix is incorrect in its application of the standard here. *As applied to the plaintiff CGM*, there would be a gigantic difference in the mind of an average viewer between the assertion that Pastor Joshua engaged in illicit conduct, and the assertion that CGM as an organization knowingly condoned and assisted him. So too, there is a gigantic difference between the assertion that *somebody* helped Pastor Joshua, and the assertion that CGM as an organization did so.

The *Eliott* case, upon which Netflix relies, supports CGM, not Netflix. *Eliott* involved a documentary series that portrayed a personal development and self-improvement organization known as "NXIVM" as an organization guilty of perpetrating sex crimes through the actions of NXIVM's senior leadership. *Eliott*, 639 F. Supp. 3d at 1020 ("Over the course of four episodes, it interweaves first-person accounts, commentary by 'cult experts,' footage from NXIVM trainings and events, and other materials to develop an 'unabashedly critical' narrative of NXIVM and its leadership. The Series culminates with the criminal prosecutions of Raniere and others.").

But unlike this suit brought by CGM against Netflix, the plaintiff in *Eliott* was *not* the organization itself—NXIVM—but rather Marc Eliott, one individual member of NXIVM who

appeared only briefly in the series and was never depicted in the series as participating in the sexual

misconduct scheme. It was against this backdrop that the court ruled against Eliott. The court did

*not* suggest that the defamation in the documentary did not defame the organization, NXIVM. To

the contrary, the court made it clear that NXIVM was the principal target of the defamation. But

NXIVM did not sue—presumably because as an organization the allegations against it were indeed

substantially true—exactly the *opposite* of what CGM has alleged here. In dismissing Eliott's

claim, the court concentrated on the fact that Eliott himself, as opposed to NXIVM, was not

depicted in the documentary as implicated in the wrongdoing:  "A reasonable viewer would not

understand the Series to suggest that Plaintiff participated in or was involved in any abuse himself.

It does imply that Plaintiff was a devoted member of an organization whose leader has been

implicated in a range of serious sexual crimes, but this assertion – however unflattering – is

substantially true." *Id*. at 1026-27. In short, the Netflix argument is a *non sequitur*. Pastor Joshua

is not the plaintiff here. Nor are any individual supporters of him. CGM is the plaintiff, and as to

CGM, the imputations in the Series are not substantially true:

> There are certain acts that only a natural being can commit. Only a natural person
> can commit the physical act of murder or rape, for example. But a corporate entity
> or organization can be legally guilty of soliciting, facilitating, conspiring, or
> condoning murder or rape, or virtually any other crime. Indeed, organizations act
> only through natural human beings, and organizations in that sense may be culpable
> in every form of human evil, from terrorism to murder to sexual assault.

Smolla, *Law of Defamation* at § 4:75. That those who allegedly were complicit in Pastor Joshua's

alleged sexual misconduct may have been his supporters and members of CGM does not negate

the reality that the Series contained alleged defamatory falsehoods of and concerning CGM itself.

For example, in *D.A.R.E America v. Rolling Stone Magazine*, 101 F. Supp. 2d 1270 (C.D.

Cal. 2000*), aff'd sub nom.*, *D.A.R.E. America v. Rolling Stone Magazine,* 270 F.3d 793 (9th Cir.

2001), a federal court in California rejected precisely the argument Netflix advances here. In that

19

case, Drug Abuse Resistance Education ("D.A.R.E.") sued *Rolling Stone* for defamation arising from an article critical of the D.A.R.E. program. *Rolling Stone* argued that the article was not "of and concerning" D.A.R.E., but rather of D.A.R.E. supporters and its founder and leader Glenn Levant. The court rejected *Rolling Stone*'s defense:

> Contrary to Defendants' contention, those statements in "Truth and D.A.R.E." referring to unlawful activity by D.A.R.E. supporters are "of and concerning" the D.A.R.E. program and Levant for defamation purposes. . . . Defendants argue that Glass's statements alleging unlawful activity are not actionable because they do not meet the "of and concerning" requirement. The accusations, . . . Defendants contend, concern not D.A.R.E. or Levant, but unnamed D.A.R.E. *supporters*. . . . The statements linking "D.A.R.E. supporters" to unlawful activity are "of and concerning" D.A.R.E. The program is referred to by reasonable implication. . . . The language of the statements at issue impliedly refer to D.A.R.E. and Levant.

*D.A.R.E.*, 101 F. Supp. 2d at 1270, 1289-90 (emphasis in original) (internal citations omitted). As in *D.A.R.E.*, this Court should find that CGM has plausibly alleged falsehoods of and concerning CGM itself, and that claims that there may (for the sake of argument) be substantial truth as to certain allegations of misconduct by others does not bar CGM's claims for defamation brought in its own right.

## V.     CGM HAS PLAUSIBLY PLED ACTUAL MALICE

This is only the pleading stage. Yet because actual malice is a quintessentially *factual* determination, at the pleading stage, the plausibility standards articulated in *Bell Atlantic Corporation v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009) must be satisfied. Neither the federal pleading standards of *Twombly* and *Iqbal* nor substantive First Amendment principles impose on plaintiffs the burden of establishing "slam-dunk" or "smoking gun" evidence of actual malice at the *pleading* stage in defamation cases. Libel plaintiffs will essentially never have direct evidence of actual malice. "As we have yet to see a defendant who admits to entertaining serious subjective doubt about the authenticity of an article it published, we

must be guided by circumstantial evidence. By examining the editors' actions, we try to understand their motives." *Eastwood v. National Enquirer, Inc*., 123 F.3d 1249, 1253 (9th Cir. 1997).  As the Third Circuit has emphasized, "[a] plaintiff may 'rarely be successful in proving awareness of falsehood from the mouth of the defendant himself.'" *Schiavone Construction Co. v. Time, Inc*., 847 F.2d 1069, 1089 (3d Cir. 1988) (quoting *Herbert v. Lando*, 441 U.S. 153, 170 (1979)). "A defendant subject to the actual malice standard 'cannot, however, . . . automatically insure a favorable verdict by testifying that he published with a belief that the statements were true." *Schiavone*, 847 F.2d at 1090-91 (quoting *St. Amant v. Thompson*, 390 U.S. 727, 732 (1968)).

"Therefore, objective circumstantial evidence can suffice to demonstrate actual malice." *Schiavone*, 847 F.2d at 1091 (citing Smolla, *Law of Defamation* § 3:14). "Such circumstantial evidence can override defendants' protestations of good faith and honest belief that the report was true." *Id.* "If all a publisher needed to do was to deny the allegation, all implied defamation suits would be dead on arrival." *Manzari v. Associated Newspapers Ltd*., 830 F.3d 881, 893 (9th Cir. 2016)*.* If this were not the law, "mere swearing could, as a matter of law, defeat any claim to which the *New York Times* standards are applicable." *Guam Federation of Teachers. v. Ysrael*, 492 F.2d 438, 439 (9th Cir. 1974), *cert. denied*, 419 U.S. 872 (1974).

Determining whether a complaint states a plausible claim for relief is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679. A court's subjective impressions of the allegations are not part of the analysis. "Rule 12(b)(6) does not countenance . . . dismissals based on a judge's disbelief of a complaint's factual allegations." *Neitzke v. Williams*, 490 U.S. 319, 327 (1989). A well-pleaded complaint may proceed to discovery even if it appears to the judge "that a recovery is very remote and unlikely." *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974). As the Court in *Twombly* acknowledged, "a well-

pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and 'that a recovery is very remote and unlikely.'" *Twombly*, 550 U.S. at 556 (quoting *Scheuer*, 416 U.S. at 236).

The plausibility standard under Rules 8(a) and 12(b)(6) plainly "does not impose a probability requirement at the pleading stage." *Twombly*, 550 U.S. at 556; *Iqbal*, 556 U.S. at 678 ("The plausibility standard is not akin to a probability requirement.") After discovery, Netflix will have a second bite at the apple. Yet, even at the summary judgment stage, a court must proceed with caution. As the Supreme Court explained in *Anderson v. Liberty Lobby*, 477 U.S. 242 (1986): "We repeat, however, that the plaintiff, to survive the defendant's motion, need only present evidence from which a jury *might* return a verdict in his favor. If he does so, there is a genuine issue of fact that requires a trial." *Id*. at 257 (emphasis added). The Supreme Court has acknowledged that determining the issue of actual malice on summary judgment presents difficult challenges. *Hutchinson v. Proxmire*, 443 U.S. 111, 120 n.9 (1979) ("The proof of 'actual malice' calls a defendant's state of mind into question . . . and does not readily lend itself to summary disposition.") (citations omitted). If sensitivity to the dangers of usurping the jury's role in determining actual malice is important at the summary judgment stage, it is exponentially more important at the pleading stage.

Again, only a plausible *inference* of actual malice is required. "Accordingly, Plaintiff need only plead sufficient facts that, if proven, create a plausible inference that the . . . Defendants published their statements with actual malice." *Spirito v. Peninsula Airport Commission*, 350 F. Supp. 3d 471, 481 (E.D. Va. 2018) (citing *Iqbal*, 556 U.S. at 678). Indeed, federal courts frequently infer actual malice at the pleading stage based on the totality of circumstances surrounding the defamation. *See, e.g.*, *Butowsky v. Folkenflik*, No. 4:18CV442, 2019 WL 3712026, at *10 (E.D.

22

Tex. Aug. 7, 2019) ("Plaintiff's allegations are not limited to only conclusory statements regarding actual malice, as Defendants suggest. Rather, Plaintiff alleges specific facts, taken as true, showing Folkenflik and NPR purposefully avoided the truth in publishing the Reports . . . The Court finds Defendants' objection regarding actual malice without merit."); *Pierson v. National Institute for Labor Relations Research*, 319 F. Supp. 3d 1100, 1111 (N.D. Ind. 2018) ("To the extent that Pierson was required to plead actual malice [the allegations were]  . . . sufficient under the federal notice pleading standard."); *Maple Heights News v. Lansky*, No. 1:15CV53, 2015 WL 4730737, at *2 (N.D. Ohio Aug. 10, 2015) ("In sum, the Court determines that the allegations in Defendant Jeffrey A. Lansky's Counterclaim against Plaintiff William C. Brownlee are more than the vague, conclusory allegations which are disfavored under *Twombly* and *Iqbal*. The Counterclaim states a right to relief that is more than mere speculation."); *Baker v. Joseph*, No. 12-CV-23300-UU, 2013 WL 12094322, at *4 (S.D. Fla. May 30, 2013) ("Although it is true that this allegation is not a model of clarity, the fact that it alleges a factual basis for Defendant's knowledge arguably carries Plaintiff's second amended complaint 'across the line from conceivable to plausible.'") (quoting *Twombly*, 550 U.S. at 570); *Spacecon Specialty Contractors, LLC v. Bensinger*, No. 09CV02080REBKLM, 2010 WL 3720166, at *2 (D. Colo. Sept. 15, 2010) ("Considering all of the allegations in the plaintiff's complaint, I conclude that these allegations are sufficient to state a claim on which relief can be granted, assuming the actual malice standard is applicable to this case."). *See also Biro v. Conde Nast*, 807 F.3d 541, 545–46 (2d Cir. 2015) ("[D]istrict courts in and out of our Circuit have inferred actual malice at the pleading stage from allegations that referred to the nature and circumstances of the alleged defamation or previous dealings with the defendant.") (citing *Tiversa Holding Corp. v. LabMD, Inc.*, Civ. A. No. 13–1296, 2014 WL 1584211, at *7 (W.D. Pa. Apr. 21, 2014) ("Given the Court's duty to accept all of Plaintiffs' factual

allegations as true and to draw all inferences therefrom in Plaintiffs' favor, the Court is satisfied at this stage in the litigation that Plaintiffs have met their burden of pleading actual malice.")); *Lynch v. Ackley*, Civ. No. 3:12CV537 (JBA), 2012 WL 6553649, at *9 (D. Conn. Dec. 14, 2012) ("Plaintiff is therefore required to plead and eventually prove malice. Notwithstanding Defendants' arguments to the contrary, Plaintiff has adequately pled all of the required elements for his libel claims."); *Ciemniecki v. Parker McCay P.A.*, Civ. No. 09–6450 (RBK/KMW), 2010 WL 2326209, at *14 (D.N.J. June 7, 2010) ("[I]f the actual malice standard were applicable, the Court is of the opinion that the Complaint alleges it sufficiently.").

CGM alleged that Netflix had in its possession material that contradicted the principal accusations against CGM. Actual malice can be inferred when a defendant publishes a defamatory statement that contradicts information known to the defendant. *See* D. Elder, *Defamation: A Lawyer's Guide* § 7.12 (2016) (collecting cases); *Palin v. New York Times*, 940 F.3d 804, 813-16 (2d Cir. 2019). As the Supreme Court has explained:

> The existence of actual malice may be shown in many ways. As a general rule, any competent evidence, either direct or circumstantial, can be resorted to, and all the relevant circumstances surrounding the transaction may be shown, provided they are not too remote, including threats, prior or subsequent defamations, subsequent statements of the defendant, circumstances indicating the existence of rivalry, ill will, or hostility between the parties, facts tending to show a reckless disregard of the plaintiff's rights, and, in an action against a newspaper, custom and usage with respect to the treatment of news items of the nature of the one under consideration. The plaintiff may show that the defendant had drawn a pistol at the time he uttered the words complained of; that defendant had tried to kiss and embrace plaintiff just prior to the defamatory publication; or that defendant had failed to make a proper investigation before publication of the statement in question. On cross-examination the defendant may be questioned as to his intent in making the publication.

*Herbert*, 441 U.S. at 164, n. 12. A "person cannot close his eyes to the obvious truth, yet still claim lack of knowledge." *Hansen v. Stoll*, 130 Ariz. 454, 458 (Ariz. Ct. App. 1981). Such "a deliberate decision not to acquire knowledge of facts that might confirm" the falsity of a story is enough to

establish actual malice. *Harte-Hanks Communications, Inc. v. Connaughton*, 491 U.S. 657, 692 (1989). As the Third Circuit has emphasized, "[w]here the defendant finds internal inconsistencies or apparently reliable information that contradicts its libelous assertions, but nevertheless publishes those statements anyway, the *New York Times* actual malice test can be met." *Schiavone*, 847 F.2d at 1090 (citing *Curtis Publishing Co. v. Butts*, 388 U.S. 130, 161 n. 22  (1967) (plurality opinion)).

CGM has plausibly alleged that a jury could plausibly and reasonably infer actual malice from Netflix's failure to correct the falsities described in CGM's application for an injunction to stop the broadcast of the Series, which was filed in Seoul in February 2023, before the Series was released. AC, ¶ 37. While actual malice must be determined at the time of the publication of the defamation, courts have long held that a subsequent failure to retract an obviously false and damaging statement may be probative of actual malice at the time the statement was originally made. While not dispositive, a defendant's refusal to retract in such circumstances is evidence of actual malice. *Burnett v. National Enquirer, Inc*., 144 Cal. App. 3d 991, 1012 (Ct. App. 1983) ("We are also satisfied that even when it was thought necessary to alleviate the wrong resulting from the false statements it had placed before the public, the retraction proffered was evasive, incomplete and by any standard, legally insufficient."). *See also*  Restatement Second, Torts § 580A, comment d at 219 (1977); *Golden Bear Distributing Systems v. Chase Revel, Inc*., 708 F.2d 944 (5th Cir. 1983); *Zerangue v. TSP Newspapers, Inc.*, 814 F.2d 1066, 1071 (5th Cir. 1987).

CGM has alleged that the facts reveal a deliberately callous decision by Netflix to enhance the dramatic impact of the Series by portraying CGM falsely and negatively, a decision made with knowledge of falsity or reckless disregard for truth or falsity. AC, ¶ 38. This decision was made within Netflix by the producers, executives, writers, and directors working for Netflix who were

responsible for the defamatory content of the Series. AC, ¶ 39. CGM has also plausibly alleged actual malice by asserting that Netflix deliberately falsified the true facts surrounding CGM. AC, ¶ 40. Any self-serving denials by Netflix at this stage must be disregarded. "Professions of good faith will be unlikely to prove persuasive, for example, where a story is fabricated by the defendant." *St. Amant*, 390 U.S. at 732). *See also Guam Federation of Teachers,* 492 F.2d at 439 ("He simply asserted that he believed that what he said was true. Such an assertion is not enough to support a directed verdict in his favor. If it were, mere swearing could, as a matter of law, defeat any action to which the *New York Times* principles are applicable."); *Eastwood*, 123 F.3d at 1256 ("[W]e find, from the totality of their choices, that the editors intended to convey the impression— known by them to be false—that Eastwood willfully submitted to an interview by the *Enquirer*. This intentional conduct satisfies the 'actual malice' standard, permitting a verdict for Eastwood.").

Among other things, CGM has alleged Netflix knew that the principal witness responsible for driving the narrative of the Series, KDH, had been found guilty multiple times of engaging in deliberate defamatory falsehoods against CGM, had recanted and retracted the key accusations that his father was beaten by persons operating on CGM's instructions, and that Netflix knew and approved of fabricated scenes, deliberate mis-translations from Korean to English subtitles, and knew that key audio recordings lacked authenticity and reliability. AC, ¶ 40. These allegations all support inferences probative of actual malice. *See Celle v. Filipino Reporter Enterprises Inc.*, 209 F.3d 163, 190 (2d Cir. 2000) (finding actual malice where the defendants relied on a single person who had a known bias against the plaintiff and whose account had internal inconsistencies); *Pep v. Newsweek, Inc.*, 553 F. Supp. 1000, 1002 (S.D. N.Y. 1983) (denying summary judgment because a reasonable jury could find that *Newsweek* acted with actual malice, and stating that "the issue is whether, knowing what *Newsweek* knew,—in particular, the identity and background of [the

author's] principal source—the *Newsweek* staff 'in fact entertained serious doubts as to the truth of [the] publication.'"); *Perk v. Reader's Digest Ass'n, Inc*., 931 F.2d 408, 411 (6th Cir. 1991) (In analyzing recklessness, "this Court must look at each source to determine whether it was reliable and whether it indicated that more research was required to determine what the truth was."). Again, all of these knowing and reckless falsehoods, CGM has alleged, were made by the producers, executives, writers, showrunners and directors working for Netflix who were responsible for the defamatory content of the Series. AC, ¶ 40.

## VI.    CALIFORNIA'S ANTI-SLAPP PROCEDURE HAS NO APPLICATION IN THIS LITIGATION

California's anti-SLAPP law, California Code of Civil Procedure § 425.16, has no application in this litigation, under both rudimentary Delaware choice-of-law principles, and evolving federal practice jurisprudence counseling against the application of state anti-SLAPP laws by federal courts sitting in diversity.

First, under Delaware choice-of-law principles, the general rule is that the "law of the forum governs procedural matters." *Chaplake Holdings, LTD. v. Chrysler Corp*., 766 A.2d 1, 5 (Del. 2001). An exception to this rule exists, however, when "the procedural rule of the foreign state is 'so inseparably interwoven with the substantive rights as to render a modification of the foregoing rule necessary, lest a party be thereby deprived of his legal rights.'" *Id., Monsanto Co. v. Aetna Cas. & Sur. Co.,* 1993 WL 563244 at *4 (Del. Super. Dec. 21, 1993).

If California's anti-SLAPP law is only procedural, then it is "game over" for Netflix under this test. And game over it is. California's anti-SLAPP law is plainly procedural, and not substantive. To begin with the most obvious, the law is codified as § 425.16 of the California *Code of Civil Procedure*. More importantly, California's anti-SLAPP law does not alter the *merits* of the

prima facie case that a defamation plaintiff must establish. It merely creates a *procedural* mechanism requiring plaintiffs to demonstrate at the front end of litigation their probable success on the merits of their substantive claims. California's anti-SLAPP law can thus apply to a wide variety of claims—not just defamation claims—and creates only a procedural mechanism for early testing those claims. The California anti-SLAPP law contains *zero* provisions dealing with the actual elements of substantive claims on their merits, and does not purport to alter those claims. This means the California anti-SLAPP law is not outcome-determinative. *See, e.g.,*, *Patel v. Chavez*, 48 Cal. App. 5th 484, 487 (2020) ("the anti-SLAPP statute is a procedural law, rather than a substantive immunity"); *Briggs v. Eden Council for Hope & Opportunity* 19 Cal.4th 1106, 1121 (1999) (anti-SLAPP statute affords "procedural protections"); *San Diegans for Open Government v. San Diego State University Research Foundation*, 13 Cal.App.5th 76, 95 (2017) ("It is important to note the anti-SLAPP statute does not immunize or insulate Defendants from any liability for claims arising from protected activity. It only provides a procedure for weeding out, at an early stage, such claims that are meritless."); *Global Relief v. New York Times Co*., No. 01 C 8821, 2002 WL 31045394, at *11 (N.D. Ill. Sept. 11, 2002 ("California's Anti–SLAPP statute is a *procedural rule* designed 'to provide for the early dismissal of meritless suits aimed at chilling the valid exercise of the constitutional rights of freedom of speech and petition for the redress of grievances.'") (emphasis added). The California cases are not alone. The Tenth Circuit, for example, reached the same conclusion as to New Mexico's anti-SLAPP law. *Los Lobos Renewable Power, LLC v. Americulture, Inc.*, 885 F.3d 659, 673 (10th Cir. 2018) ("In this case, the line between procedure and substance is clear. A plain reading of the New Mexico anti-SLAPP statute reveals the statute is not designed to influence the *outcome* of an alleged SLAPP suit but only the timing of that outcome.") (emphasis in original). As a procedural mechanism only, under Delaware

choice-of- law principles, the California anti-SLAPP law does not apply in Delaware courts. As in *Chaplake*, a Delaware court's refusal to apply the California anti-SLAPP law here would not deprive Netflix of any *substantive legal right*. "There is no basis for invoking the foreign procedural law exception here." *Chaplake*, 766 A.2d at 5.

Second, there is gathering momentum from multiple federal circuits holding that federal courts sitting in diversity may not apply state anti-SLAPP laws. Shortly after states began enacting anti-SLAPP laws, two federal Circuits held that such laws did apply in federal courts sitting in diversity. *See United States ex rel. Newsham v. Lockheed Missiles & Space Co.*, 190 F.3d 963, 973 (9th Cir.1999); *Godin v. Schencks*, 629 F.3d 79 (1st Cir. 2010). But then the tide turned, beginning with *Abbas v. Foreign Policy Grp., LLC*, 783 F.3d 1328 (D.C. Cir. 2015), an opinion by then-Judge Brett Kavanaugh, now Supreme Court Justice Kavanaugh. The *Abbas* Court, applying the Supreme Court's decision in *Shady Grove Orthopedic Associates, P.A. v. Allstate Insurance Co*., 559 U.S. 393 (2010), held that the District of Columbia's anti-SLAPP law could not be applied by a federal court sitting in diversity because the anti-SLAPP statute conflicted with the Federal Rules of Civil Procedure. Other circuits have subsequently followed *Abbas. See Carbone v. Cable News Network, Inc.*, 910 F.3d 1345, 1356 (11th Cir. 2018); *Klocke v. Watson*, 936 F.3d 240, 248 (5th Cir. 2019); *La Liberte v. Reid*, 966 F.3d 79, 88 (2d Cir. 2020). Significantly, the opinion of now-Justice Kavanagh in *Abbas* cited with approval the views of Ninth Circuit Judges Kozinski and Watford, who maintained that the Ninth Circuit was wrong in permitting California's anti-SLAPP to be applied in federal courts sitting in diversity and should abandon that precedent. *Abbas*, 783 F.3d at 1344 (citing *Makaeff v. Trump University, LLC*, 715 F.3d 254, 274 (9th Cir. 2013) (Kozinski, J., concurring) ("Federal courts have no business applying exotic state procedural rules which, of necessity, disrupt the comprehensive scheme embodied in the Federal Rules.")); *Makaeff v. Trump*

29

*University, LLC*, 736 F.3d 1180, 1188 (9th Cir. 2013) (Watford, J., dissenting from denial of rehearing *en banc*) ("California's anti-SLAPP statute impermissibly supplements the Federal Rules' criteria for pre-trial dismissal of an action.").

The Third Circuit has yet to weigh in on the question, but two district court decisions in this Circuit have refused to apply state anti-SLAPP laws in federal diversity cases. In *In re Johnson & Johnson Talcum Powder Products Manufacturing, Sales Practices, and Products Liability Litigation*, 553 F. Supp. 3d 211, 221 (D.N.J. 2021) the court, after canvassing the circuit split, sided with *Abbas* and refused to apply the District of Columbia's anti-SLAPP law. And in *Broughty v. Bouzy*, No. CV226458SDWJRA, 2023 WL 5013654 (D.N.J. Aug. 7, 2023), the court refused to apply New York's anti-SLAPP law, holding that to the extent that the New York anti-SLAPP "law requires defamation pleadings to show a 'substantial basis,' that heightened pleading standard would conflict with Rule 8's pleading requirements and thus would not govern here." *Id.* at *3. This Court should follow the lead of Supreme Court Justice Kavanagh, the D.C. Circuit, the Second, Fifth, Tenth, and Eleventh Circuits, the dissenting Judges of the Ninth Circuit, and the two fellow district courts in this Circuit, and hold that application of state anti-SLAPP laws cannot be reconciled with the procedural regime established under the Federal Rules of Civil Procedure, and therefore, cannot be applied in this federal court sitting in diversity.

Dated: September 9, 2024

Of Counsel:

Alexander Rufus-Isaacs
RUFUS-ISAACS ACLAND &
GRANTHAM LLP
9440 Santa Monica Blvd., Suite 301
Beverly Hills, CA 90210
Phone: (310) 274-3803
aisaacs@rufuslaw.com

Respectfully submitted,

FARNAN LLP

/s/ Brian E. Farnan
Brian E. Farnan (Bar No. 4089)
Michael J. Farnan (Bar No. 5165)
919 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 777-0300
bfarnan@farnanlaw.com
mfarnan@farnanlaw.com

*Attorneys for Plaintiff*